**Rickey OSBORNE, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

**No. 34S00–0009–CR–531.**

Supreme Court of Indiana.

Sept. 13, 2001.

William C. Menges, Jr., Howard County Public Defender, Kokomo, IN, Attorney for Appellant.

Karen M. Freeman–Wilson, Attorney General of Indiana, Arthur Thaddeus Perry, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellees.

RUCKER, Justice.

A jury convicted Rickey Osborne of attempted murder, burglary, and robbery in connection with the iron bar and hammer beating of Dan Williams. Osborne then pleaded guilty to being a habitual offender. The trial court sentenced Osborne to a total term of 100 years. In this direct appeal, we address the following rephrased issues: (1) did the trial court deny Osborne his right of self-representation; (2) did the trial court err by admitting into evidence Osborne's confessions; (3) did the trial court erroneously allow two testifying police officers to remain in the courtroom throughout the trial despite ordering a separation of witnesses; (4) was the evidence sufficient to support Osborne's conviction for attempted murder; and (5) did

the trial court's use of Osborne's pre-trial conduct to both convict him of criminal contempt and enhance his attempted murder conviction violate the Double Jeopardy Clause of the United States Constitution.

We affirm the trial court.

### Facts

The facts most favorable to the verdict show that on the afternoon of December 5, 1998, Osborne and his twenty-year-old nephew Charles Osborne broke into the Kokomo home of Dan Williams because they knew he kept large sums of money in his house. While Osborne and Charles were searching for money, Mr. Williams came home. Osborne and Charles hid in the basement. Osborne then instructed Charles to find something with which to hit Mr. Williams. Charles decided on a hammer, and Osborne selected an iron bar. When Osborne and Charles went back upstairs, Osborne struck Mr. Williams approximately seven times in the head and face with the iron bar and hammer, and then Charles struck him approximately twelve times with the hammer. Osborne took Mr. Williams' wallet from his pants pocket, which contained $1,000 in cash. Osborne and Charles then fled the scene. Despite his injuries, Mr. Williams was able to call 911.

Police apprehended Osborne and Charles near Mr. Williams' house shortly after the 911 call. Police returned them to the crime scene, but Mr. Williams was unable to make a positive identification. Police then released Osborne and Charles. However, Charles later confessed to the crimes and implicated Osborne. A warrant was issued for Osborne's arrest, and police apprehended him two days later in Madison County.

The State initially charged Osborne with burglary and robbery. Thereafter, the State filed an amended information adding the charge of attempted murder and alleging that Osborne was a habitual offender.

A jury convicted Osborne of attempted murder, burglary, and robbery. He then pleaded guilty to being a habitual offender. The trial court sentenced Osborne to presumptive, concurrent sentences of thirty years for burglary and ten years for robbery and also ordered an enhanced, consecutive forty-year sentence for attempted murder, increased by thirty years for the habitual offender status. Osborne now appeals. Additional facts are set forth below where relevant.

### Discussion

#### I.

Osborne first contends the trial court denied him his right to self-representation. The basis of a defendant's right to self-representation under the Sixth Amendment of the United States Constitution was articulated in *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). In *Faretta*, the United States Supreme Court held that a State may not "constitutionally hale a person into its criminal courts and there force a lawyer upon him, even when he insists that he wants to conduct his own defense." *Id.* at 807, 95 S.Ct. 2525. The Court acknowledged that when a defendant manages his own defense, he relinquishes many of the traditional benefits associated with the right to counsel, such as an attorney's training and experience, and may even "conduct his own defense ultimately to his own detriment." *Id.* at 834–35, 95 S.Ct. 2525. Therefore, the Court declared that in order for an accused to represent himself, he must knowingly, intelligently, and voluntarily forgo these relinquished benefits. *Id.* at 835, 95 S.Ct. 2525.

However, before waiving these benefits, a trial court must make an accused "aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with

eyes open.'" *Id.* (quoting *Adams v. United States ex rel. McCann,* 317 U.S. 269, 279, 63 S.Ct. 236, 87 L.Ed. 268 (1942)). "There are no prescribed 'talking points' the court is required to include in its advisement to the defendant; it need only come to a considered determination that the defendant is making a voluntary, knowing, and intelligent waiver." *Poynter v. State,* 749 N.E.2d 1122, 1126 (Ind.2001).

■ In addition, although a defendant need not have the skill and experience of an attorney, he must be competent to stand trial. *Godinez v. Moran,* 509 U.S. 389, 400, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993). That is, he must have the mental capacity to understand the proceedings. *Id.* at 401 n. 12, 113 S.Ct. 2680. Before claiming that his right to self-representation has been denied, a defendant must timely, clearly, and unequivocally assert that right. *Dobbins v. State,* 721 N.E.2d 867, 871 (Ind.1999); *Sherwood v. State,* 717 N.E.2d 131, 135 (Ind.1999). If a defendant's right to self-representation has been denied, a new trial is warranted because this right is not subject to harmless error analysis. *McKaskle v. Wiggins,* 465 U.S. 168, 177 n. 8, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984).

Osborne's initial hearing took place on December 10, 1998. At that time, the trial court advised him of the charges of burglary and robbery:

> JUDGE PARRY: Now you understand, Mr. Osborne, you have the right to be represented by counsel, someone you hire that you choose and pay for or if you want an attorney but cannot afford to hire one, you can ask for the appointment of the public defender to represent you at no cost or you can represent yourself without counsel, you understand those choices?
>
> THE DEFENDANT: Sure do.
>
> JUDGE PARRY: What do you intend to do about an attorney, sir?

> THE DEFENDANT: I'll represent myself.
>
> JUDGE PARRY: Not by me. You'll get the public defender. With a Class A felony—

R. at 263–64. The State filed an amended information on January 14, 1999. The trial court held a second initial hearing on the additional charges of attempted murder and habitual offender status on January 21, 1999. At this initial hearing, the following discussion took place:

> JUDGE PARRY: Now as to these other two charges you have the same rights as you had previously as to the original ones. In fact your trial is already set. *You have the right to counsel, which you have.* You have the right to a speedy trial, which you asked for, and you have the right to confront witnesses. Those rights all remain again for these, you understand that?
>
> THE DEFENDANT: Yes, Your Honor.

R. at 272 (emphasis added). Osborne made no request for self-representation at the second initial hearing.

■ We first observe that it would have been better practice for the trial court to determine Osborne's competency and advise him of the perils of proceeding pro se before ruling on his request to represent himself. *See Dobbins,* 721 N.E.2d at 872 ("Generally, a trial court should conduct a pre-trial hearing to determine a defendant's competency to proceed without counsel and to establish a record of a defendant's waiver of his right to counsel."). However, by not acting consistent with his earlier request to represent himself when the trial court advised him during the second initial hearing of his rights regarding counsel, Osborne acquiesced in the presentation of his defense by appointed counsel. *See Sherwood,* 717 N.E.2d at 136 (in arriving at the conclusion that the defendant's right to self-represen-

tation was violated, this Court found significant that "[t]hroughout the entire trial, [the defendant] at no time acquiesced in the presentation of a defense by appointed counsel."); cf. Stone v. State, 531 N.E.2d 191, 194 (Ind.1988) (declaring that when a defendant makes a motion for a speedy trial, he is required to maintain a position which is reasonably consistent with that request; otherwise, he is considered to have abandoned the request, and the motion ceases to have legal viability). We therefore conclude that the trial court did not violate Osborne's right to self-representation.

## II.

■■ Osborne gave two confessions to police: one on the way to the police station and the other, which was tape-recorded, at the police station. The trial court, over defense counsel's timely objections, admitted both statements into evidence. In this appeal, Osborne challenges their admission on the ground that they occurred after he requested an attorney. Once a suspect asserts the right to counsel, police must cease interrogation until counsel is present or the suspect initiates further communication with police. Minnick v. Mississippi, 498 U.S. 146, 156, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990); Oregon v. Bradshaw, 462 U.S. 1039, 1043, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983); Edwards v. Arizona, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). However, the initiation of further communication by an accused, standing alone, is not sufficient to establish a waiver of the previously asserted right to counsel. Grimm v. State, 556 N.E.2d 1327, 1330 (Ind.1990). If the accused is found to have initiated further communication, then the subsequent inquiry is whether there is a valid waiver of the right to counsel; that is, whether the purported waiver was knowing and intelligent and found to be so under the totality of the circumstances. Id.

The record shows police apprehended Osborne in Madison County two days after the crimes occurred. When Detectives Donald Whitehead and Mike Sanders from the Kokomo Police Department arrived at the Madison County jail to transport Osborne back to Howard County, they advised Osborne of his Miranda rights, and he signed a waiver of those rights. However, Osborne then requested an attorney, at which point the detectives ceased all questioning. En route to Howard County, Osborne began asking the detectives how they had located him. Detective Whitehead responded that he could not discuss the case because Osborne had invoked his right to counsel. Osborne then attempted to discuss the case two more times with Detective Whitehead, who twice responded that he could not discuss the case because Osborne had invoked his right to counsel. Shortly thereafter, Osborne exclaimed, "Oh, I'm going to represent myself; I don't care; I want to talk about it; I want to know how you found me." R. at 855. Osborne then admitted that he "beat that old man" and that he meant to kill him. Id. Detective Whitehead asked Osborne if he would give a tape-recorded statement when they arrived at the Kokomo Police Department, and Osborne agreed. In his tape-recorded statement, the following exchange occurred before Osborne gave a full confession to the crimes:

[Detective Whitehead]: Okay. Richard [Osborne], prior to this discussion, myself and Detective Sanders picked you up at the Madison County Jail where you had been transported after being arrested on a warrant out of Howard County today. Is that correct?

[Osborne]: Yeah.

[Detective Whitehead]: And prior to speaking with you in Madison County I read to you what was titled an "Interrogation: Advice of Rights" form[ ]?

[Osborne]: Yeah.

[Detective Whitehead]: Did you understand all those rights as read to you?

[Osborne]: Yeah.

[Detective Whitehead]: Did you affix your signature to the waiver of those rights at that time in Madison County?

[Osborne]: Yeah.

[Detective Whitehead]: And during that initial conversation you didn't wish to speak to us, is that correct?

[Osborne]: Right.

[Detective Whitehead]: And later on the way back to Kokomo in the car you initiated a conversation with myself and Detective Sanders regarding this investigation, is that correct?

[Osborne]: Yeah.

[Detective Whitehead]: And you said at that time that you wanted to tell us what happened?

[Osborne]: Yeah.

[Detective Whitehead]: And you in fact began that conversation [ ]. You began that conversation by telling us that you, you had in fact broken into Dan Williams' house Saturday and beaten him with a hammer is that correct?

[Osborne]: Yeah.

R. at 41.

■ The totality of the circumstances shows that Osborne knowingly, intelligently, and voluntarily waived his right to counsel. Osborne asked Detective Whitehead on three separate occasions how they had located him. Each time Detective Whitehead responded that he could not discuss the case because Osborne had invoked his right to counsel. Undeterred by Detective Whitehead's warnings, Osborne then stated that he did not care about the fact that he had invoked his right to counsel because he was going to represent himself at trial. Osborne then confessed and agreed to give a tape-recorded statement at the police station, which he did shortly thereafter. At the beginning of the tape-recorded statement, Detective Whitehead reminded Osborne of his *Miranda* rights as well as the waiver that he had previously signed. Thus, the trial court did not err in admitting Osborne's confessions. *See Owens v. State,* 732 N.E.2d 161, 164 (Ind.2000) (holding that the trial court did not err in admitting the defendant's confession where the defendant requested an attorney, police ceased all questioning, and the defendant initiated further communication, admitted to the crime, and then gave a full tape-recorded confession after police read him his *Miranda* rights).

### III.

Osborne next contends the trial court erroneously allowed two Kokomo police officers, both testifying witnesses, to remain in the courtroom throughout the trial. Defense counsel requested, and the trial court ordered, a separation of witnesses pursuant to Indiana Evidence Rule 615, which provides:

At the request of a party, the court shall order witnesses excluded so that they cannot hear the testimony of or discuss testimony with other witnesses, and it may make the order on its own motion. This rule does not authorize the exclusion of (1) a party who is a natural person, or (2) an officer or employee of a party that is not a natural person designated as its representative by its attorney, or (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause.

After the trial court ordered the separation of witnesses, the prosecutor requested to keep two police officers at counsel table during trial—presumably one as an officer of the State under clause (2) and the other as a person essential to the presentation of the State's case under clause (3). The prosecutor gave the following reasoning:

"[T]he complex nature of this case and the fact that these officers supervised the investigation on different shifts and therefore had responsibilities for different parts of the investigation would require that I have them both in the courtroom with me." R. at 381. Over defense counsel's objection, the trial court permitted both police officers to remain in the courtroom throughout the trial. *Id.*

Although the majority view on this issue is reflected in Justice Boehm's concurring opinion, we recently explained that the basic premise of Rule 615 is that, upon request of any party, witnesses should be insulated from the testimony of other witnesses. *Long v. State*, 743 N.E.2d 253, 256 (Ind.2001). Therefore, Rule 615's exemptions should be "narrowly construed and cautiously granted." *Id.* A party seeking to exempt a witness from exclusion as "essential to the presentation of the party's cause" under clause (3) must convince the trial court that the "witness has such specialized expertise or intimate knowledge of the facts of the case that a party's attorney would not effectively function without the presence and aid of the witness." *Id.* (quotation omitted). Exclusion under clause (3) is thus inappropriate where a person excluded under clauses (1) and (2) can provide the expertise and knowledge adequate to assist counsel. *Id.* The determination of whether a witness qualifies for the exemption found in clause (3) is within the trial court's discretion and is subject to review for an abuse of that discretion. *Id.* at 256–57.

Osborne does not challenge the prosecutor's explanation that the complex nature of this case and the police officers' division of responsibilities required them both to remain at counsel table during trial. Nor does he allege or point to any evidence in the record that the trial court abused its discretion. Further, our own review of the record does not show an abuse of discretion. Osborne has failed to meet his burden of showing that the trial court abused its discretion in permitting the two police officers to remain in the courtroom throughout the trial.

### IV.

Osborne next contends the evidence is insufficient to support his attempted murder conviction. The standard for reviewing sufficiency of the evidence claims is well settled. We do not reweigh the evidence or judge the credibility of the witnesses. *Albrecht v. State*, 737 N.E.2d 719, 731 (Ind.2000). We will affirm the trial court if the probative evidence and reasonable inferences drawn from the evidence could have allowed a reasonable jury to find the defendant guilty beyond a reasonable doubt. *Id.*

To establish attempted murder, the State must prove beyond a reasonable doubt that (1) the defendant acted with the specific intent to kill; and (2) the defendant engaged in conduct constituting a substantial step toward commission of the crime. *Mitchem v. State*, 685 N.E.2d 671, 676 (Ind.1997). "Intent may be inferred from the use of a deadly weapon in a manner likely to cause death or great bodily harm." *Id.* (quotation omitted).

Osborne claims that the State failed to meet its burden because his intent was to knock out Mr. Williams, not to kill him. However, Osborne's confessions and actions show otherwise. Osborne told Detective Whitehead on the way to the police station that he intended to kill Mr. Williams. R. at 855. Osborne expanded on this in his tape-recorded confession:

[Detective Whitehead]: And what were you gonna do to [Mr. Williams when you went back upstairs]?

[Osborne]: We was gonna kill him. Or try to anyways. That's why we hit him in the head.

[Detective Whitehead]: And why would you want to kill him to take his money?

[Osborne]: So he couldn't call you guys.

. . .

[Detective Whitehead]: So it was your intent Saturday when you went in his house to, to kill him and take his money? Was that Charlie's plan too?

[Osborne]: He, he knew what I had in my mind. . . .

. . .

[Detective Whitehead]: [After you hit him] [d]id you think he was dead?

[Osborne]: I knew there wasn't no sense to keep hitting him cause he wasn't moving. The whole time we was hitting him he was fighting. The last time we hit him he quit moving so—

[Detective Whitehead]: So you didn't know whether he was dead or not?

[Osborne]: No.

[Detective Whitehead]: Would it have surprised you if he was? No?

[Osborne]: I thought we hit him enough times, you know what I mean?

[Detective Whitehead]: So your intent was to go in there and wait on him and then kill him and you thought that you had possibly done that?

[Osborne]: Right.

R. at 44, 45, 50–51. Additionally, according to both Charles' trial testimony and Osborne's tape-recorded confession, Osborne struck Mr. Williams approximately seven times in the head and face with an iron bar and hammer. R. at 46–49, 508–12. The evidence is sufficient to support Osborne's conviction for attempted murder.

## V.

When the trial court denied Osborne's request to represent himself at the first initial hearing, Osborne erupted, calling the judge various insulting names and threatening him. Even after warnings, Osborne continued verbally attacking the judge. As a result, the judge found Osborne in direct criminal contempt and sentenced him to 120 days imprisonment with no good time credit. R. at 25, 265–66. At sentencing, the trial court enhanced Osborne's sentence for attempted murder by ten years in part because of Osborne's behavior during the first initial hearing which landed him a criminal contempt conviction. R. at 980–81.

■ Osborne contends that the trial court's use of his pre-trial conduct to both convict him of criminal contempt and enhance his attempted murder conviction violates the Double Jeopardy Clause of the United States Constitution because he was punished twice for the same offense. However, we have held that enhancements for earlier convictions "are not punishments; they are merely tools enabling a trial court to impose an appropriate sentence for the *current* conviction." *Elmore v. State*, 657 N.E.2d 1216, 1220 (Ind.1995). As such, Osborne was not punished twice for the same offense.

■ Further, when enhancing Osborne's attempted murder conviction, the trial court found no mitigators and another aggravator: Osborne's criminal history. R. at 980. Only one aggravator is necessary for a trial court to enhance a sentence. *Georgopulos v. State*, 735 N.E.2d 1138, 1146 (Ind.2000). The trial court did not err in enhancing Osborne's sentence for attempted murder.

### Conclusion

We affirm the judgment of the trial court.

SULLIVAN, J., concurs. SHEPARD, C.J., and DICKSON and BOEHM, JJ., concur in Parts I, II, IV and V.

BOEHM, J., concurs in result with separate opinion as to Part III, in which SHEPARD, C.J., and DICKSON, J., join.

BOEHM, Justice, concurring.

■ I concur in Parts I, II, IV, and V. I believe that the trial court should not have allowed two police officers to remain in the courtroom after granting a separation of witnesses order pursuant to Indiana Rule of Evidence 615. I also believe that the burden of showing harmless error falls on the State, but because that burden is satisfied in this case, I concur in result in Part III.

Prior to the adoption of Indiana Rule of Evidence 615, when a motion for separation of witnesses was granted, each party had a right to have one person in the courtroom to assist counsel. *Bell v. State*, 610 N.E.2d 229, 233 (Ind.1993). It was also the common law rule that the party representative could be a police officer who was also a testifying witness. *Id.* These rules were supplanted by Rule 615, which abolished the automatic exemption for police officers and gave the trial court discretion to allow witnesses to remain in the courtroom if they met any of the three criteria specified in the rule. The second of these allows "an officer or employee of a party that is not a natural person designated as its representative by its attorney." Several Indiana cases have held that a police officer who has a supervisory role in the investigation of the defendant meets this test as a representative of the State. *Stafford v. State*, 736 N.E.2d 326, 330 (Ind. Ct.App.2000); *Heeter v. State*, 661 N.E.2d 612, 614–15 (Ind.Ct.App.1996); *Fourthman v. State*, 658 N.E.2d 88, 91 (Ind.Ct. App.1995).

■ In this case, the State asked that two police officers remain at the prosecutor's table throughout the trial without reference to any of the Rule 615 exemptions. The purpose of the party representative exemption is to humanize those parties who are not natural persons. It allows only one representative. *Stafford*, 736 N.E.2d at 329–30. One or more witnesses may be permitted under the third exemption in Rule 615 for persons "essential to the presentation of the party's cause." To be present under this provision the trial court must be persuaded that the "witness has such specialized expertise or intimate knowledge of the facts of the case that a party's attorney could not effectively function without the presence and aid of the witness." *Hernandez v. State*, 716 N.E.2d 948, 950 (Ind. 1999). As the Court points out, Rule 615's exemptions "should be narrowly construed and cautiously granted." *Osborne v. State*, 754 N.E.2d 915, —— (Ind.2001) (citing *Long v. State*, 743 N.E.2d 253, 256 (Ind.2001)). Accordingly, if an "essential witness" is an employee of the institutional party, there is no reason to permit an additional investigative witness as a representative of the party to avoid the problem of a human being versus an empty chair. Therefore, if two are needed, both must be qualified as essential.

The Advisory Committee Notes to Federal Rule of Evidence 615, the federal counterpart to Indiana Rule of Evidence 615, state that the essential witness "category contemplates such persons as an agent who handled the transaction being litigated or an expert needed to advise counsel in the management of the litigation." This case does not turn on scientific or other specialized knowledge, so only the need for mastery of complex facts can be cited as a reason to exempt additional witnesses. Earlier this year, this Court affirmed a trial court's decision to allow an FBI agent to sit with the prosecutor as an "essential" witness. *Long*, 743 N.E.2d at 256–57. In the course of the seven-day trial, forty-five non-police, non-expert witnesses testified for the State and sixty-six exhibits were offered into evidence by the

State. In preparation for the trial, the police conducted over 500 witness interviews and executed thirty searches during three to four years of police work covering leads in Ohio, Illinois, and Indiana. *Id.* In that case, the FBI agent was "essential" to the prosecutor because he was familiar with the details of a complex and lengthy investigation.

In this case, the prosecutor contended that the two officers were "essential" because "the complex nature of this case and the fact that these officers supervised the investigation on different shifts and therefore had responsibilities for different parts of the investigation would require that I have them both in the courtroom with me." Osborne, however, was apprehended immediately after the crime took place, was arrested two days later, and gave two confessions to police, both of which were admitted at trial. Unlike *Long,* this case did not involve complicated facts, a plethora of witnesses, or an extensive investigation. There is no showing that the presence of any witness was essential.

A number of police officers testified at Osborne's trial, but the record does not indicate which two officers were allowed to stay in the courtroom despite the witness separation order. Osborne does not indicate what prejudice he might have suffered as a result of the officers' presence in the courtroom and his failure to identify which officers were affected makes it impossible for us to guess at what prejudice might exist. The opinion of the Court concludes that Osborne has failed to meet his burden of showing that the trial court abused its discretion. But as I observed in dissent in *Hernandez v. State,* it is often difficult or impossible to assess the effect on the testimony of a witness of having heard the testimony of others. 716 N.E.2d at 954–55. For that reason, I would follow the federal circuits that require the party supporting the erroneous decision to show

that the error was harmless. I think that Osborne is entitled to a presumption of prejudice that the State must overcome to prevail. *Hernandez,* 716 N.E.2d at 955.

All of the foregoing does not cause me to dissent from the result in this case. The State presented overwhelming evidence supporting Osborne's conviction independent of the testimony of investigating officers. Osborne confessed, DNA testing matched Osborne to a weapon used in the attack, and Osborne's accomplice testified against him. Under these circumstances, even if we assume the testimony of the unsequestered witnesses was shaped by their presence in the courtroom, I would find the error to be harmless.

Accordingly, I concur in result as to Part III of the majority opinion.

SHEPARD, C.J., and DICKSON, JJ., concur.